**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3716
_____

JERYL TURCO

v.

CITY OF ENGLEWOOD, NEW JERSEY,
                                        Appellant
_____

Appeal from the United States District Court
for the District of New Jersey
(No. 2-15-cv-03008)
District Judge: Honorable Susan D. Wigenton
_____

Argued July 17, 2018
_____

Before: McKEE, VANASKIE[*] and SILER[**], *Circuit Judges*.

(Opinion Filed: August 19, 2019)
_____

---

[*] The Honorable Thomas I. Vanaskie retired from the Court on January 1, 2019 after the submission of this case, but before the filing of the opinion. This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and Third Circuit I.O.P. Chapter 12.

[**] The Honorable Eugene E. Siler, Jr., United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

Donald A. Klein **[Argued]**
Weiner Law Group
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054
　　　*Attorney for Appellant*

Francis J. Manion **[Argued]**
American Center for Law and Justice
6375 New Hope Road
New Hope, KY 40052
　　　*Attorney for Appellee*

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge*.

The City of Englewood, New Jersey, appeals the District Court's grant of summary judgment in favor of a plaintiff who claimed that an ordinance the City enacted to create a buffer zone around clinics where abortions are performed violated her freedom of speech, association, and assembly. Because we conclude that there are genuine issues of material fact precluding the entry of summary judgment to either side, we will reverse and remand for further proceedings.

## I. BACKGROUND

In March 2014, the City Council of Englewood amended its ordinances to address aggressive antiabortion protests that had been regularly occurring outside of Metropolitan Medical Associates ("MMA" or "the clinic")—a health clinic that provided reproductive health services, including abortions, to women.[1] We will discuss the incidents at MMA in more detail below, but at the outset, it is important

_____

[1] The facts included in this preliminary recitation are undisputed by the parties.

2

to note that this dispute arises against a background that included "militant activists and aggressive protestors" beginning to gather outside of the facility in late 2013.[2] Many of these protestors were associated with an evangelical ministry called the Bread of Life. The Bread of Life had ties to other radical antiabortion organizations including those which support violent reprisal against abortion providers. The Bread of Life protestors engaged in extremely aggressive, loud, intimidating, and harassing behavior towards patients, their companions, and even other groups whose views generally aligned with the Bread of Life's antiabortion position.

The new ordinance read:

A. Definitions. As used in this section, the following terms shall have the meanings indicated:

1. "Health care facility" — as set forth in N.J.S.A. 26:2H 2. 2. "Transitional facility" — Community residences for the developmentally disabled and community shelters for victims of domestic violence as those terms are defined in N.J.S.A. 40:55D-66.2.

B. Within the City of Englewood, no person shall knowingly enter or remain on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance,

---

[2] JA 428.

exit or driveway. This subsection shall not apply to the following

    1. persons entering or leaving such facility;

    2. employees or agents of such facility acting within the scope of their employment

    3. law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

    4. persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility

C. The provisions of subsection B shall only take effect during such facility's business hours and if the area contained within the radius and rectangle described in said subsection B is clearly marked and posted.

The practical effect of the ordinance was the creation of three overlapping buffer zones at any qualifying facility. Two semicircular buffer zones extended outwards eight feet from either side of the facility's entrance. The third buffer zone spanned the width of the facility's entrance and extended to the street. A picture of the buffer zones (shown in yellow) is set forth below:



Prior to enacting the disputed ordinance, the City had increased police patrols on mornings when it anticipated Bread of Life protestors would be present.[3] Police officers present on the scene imposed informal "no go zones" where protestors could not stand. Those zones were similar to the buffer zones that were part of the Ordinance. Although the police presence temporarily eased tensions at MMA, the hostile protests and resulting problems resumed immediately after officers left the clinic.

Plaintiff/Appellee Jeryl Turco was not one of the hostile or aggressive anti-abortion protestors. Rather, she refers to herself as a "sidewalk counselor." It is undisputed that, unlike the violent and aggressive anti-abortion protestors affiliated with groups such as Bread of Life, her practice was to calmly approach women entering the clinic and attempt to engage in peaceful, nonconfrontational communication. She believes that such conversational interaction is far more effective than the tactics favored by the aggressive protestors. In addition, Turco routinely offered rosaries and literature about prenatal care to patients entering the clinic. She also invited the women to accompany her to a crisis pregnancy center across the street, and often attempted to reassure the women by telling them

---

[3] The Bread of Life protestors generally gathered on Saturday mornings.

things such as: "we can help you" and "we are praying for you."

Turco brought this action against the City of Englewood pursuant to 42 U.S.C. § 1983 to enjoin enforcement of the Ordinance because she believed that it hampered her efforts to provide counseling. She alleged that the Ordinance violated her First Amendment rights to freedom of speech, assembly, and association. She sought a declaration that the Ordinance was unconstitutional on its face and as applied and sought to enjoin its enforcement.

The District Court held the motion in abeyance until we decided *Bruni v. Pittsburgh*,[4] a case involving a similar ordinance in the City of Pittsburgh that was then pending in our court. After we decided *Bruni*, Turco elected not to renew her motion for a preliminary injunction, and the parties proceeded to discovery. Upon completion of discovery, the District Court granted Turco's cross-motion for summary judgment.[5]

The District Court concluded that the statute was overbroad and not narrowly tailored to serve the government's interest. In explaining why it believed the Ordinance was overbroad, the Court explained that the City "did not create a targeted statute to address the specific issue of congestion or militant and aggressive protestors outside of the Clinic."[6] Rather, it found that the City had "created a sweeping regulation that burdens the free speech of individuals, not just in front of the Clinic, but at health care and transitional facilities citywide."[7]

Perhaps somewhat understandably, the District Court's overbreadth analysis overlapped considerably with its narrow tailoring analysis.[8] The District Court found that the statute

---

[4] 824 F.3d 353 (3d Cir. 2016).

[5] *Turco v. City of Englewood*, No. 2:15-cv-03008, 2017 WL 5479509, at *1 (D. N.J. Nov. 14, 2017).

[6] *Id.* at *4.

[7] *Id.*

[8] *See id.* (addressing the "narrowly-tailored requirement" in the overbreadth analysis section).

6

was not narrowly tailored because the City failed to demonstrate that it had "employ[ed] alternative, less restrictive means" of addressing the hostile protestors on the clinic's sidewalk.[9] Instead, the Court found, the City had "put[] forth speculative assertions that it tried and/or seriously considered less restrictive alternatives, such as increased police presence [or] injunctive relief, prior to adoption of the amended Ordinance."[10] Accordingly, the Court granted Turco's motion for summary judgment, and this appeal followed.

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review appeals from the grant of summary judgment *de novo*.[11] We apply the same test as the district court: viewing the evidence in the light most favorable to the nonmoving party, we ask whether there is any genuine issue of material fact.[12] "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue."[13]

## III. DISCUSSION

We analyze § 1983 lawsuits that allege a First Amendment violation using a three-part test.[14] First, we determine whether the First Amendment protects the speech at issue.[15] Next, we consider the "nature of the forum."[16] Finally, we resolve "whether the [government's] justifications for

---

[9] *Id.* at *5.

[10] *Id.*

[11] *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011) (*en banc*).

[12] *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).

[13] *Id.* (internal quotation marks omitted) (quoting *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)).

[14] *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

[15] *Id.*

[16] *Id.*

exclusion from the relevant forum satisfy the requisite standard."[17]

Only the third prong of the test is at issue in this appeal. The City concedes that the First Amendment fully protects the speech at issue here and that the Ordinance clearly regulates speech in a traditional public forum (i.e., the sidewalk).[18] The parties also agree—as do we—that the restrictions imposed are content-neutral because they regulate "the total quantity of speech by regulating the time, the place or the manner in which one can speak . . . ."[19] The Ordinance impacts the speech of those who support abortion as well as those who oppose it; it is clearly content neutral.[20] We therefore apply intermediate scrutiny.[21] Accordingly, to withstand constitutional scrutiny,

---

[17] *Id.*

[18] *See Turco*, 2017 WL 5479509, at * 4 (noting that Englewood did "not challenge the fact that the speech at issue is protected under the First Amendment, or that its Ordinance suppresse[d] speech in a traditional forum"). Indeed, public streets and sidewalks are the "quintessential public forum" and occupy a "special position in terms of First Amendment protection." *Bruni*, 824 F.3d at 366 (citation and internal quotation marks omitted). When the government imposes restrictions on communication in these areas, "it imposes an especially significant First Amendment burden." *Id.* (citation and internal quotation marks omitted).

[19] *Rappa v. New Castle Cnty.*, 18 F.3d 1043, 1053–54 (3d Cir. 1994) (citations omitted).

[20] *See McCullen v. Coakley*, 573 U.S. 464, 485 (2014). As explained in depth below, *McCullen* considered a legislatively enacted buffer zone similar to the one enacted here. The Supreme Court concluded that such enactments were "neither content nor viewpoint based and therefore need not be analyzed under strict scrutiny." *Id.* In light of this authority and the parties' agreement that we should apply intermediate scrutiny, we need not discuss the appropriate level of scrutiny in detail.

[21] *Id.* at 485–86.

the Ordinance must be "narrowly tailored to serve a significant governmental interest."[22]

This "tailoring requirement does not simply guard against an impermissible desire to censor."[23] Rather, "by demanding a close fit between ends and means," the narrow tailoring requirement prevents the suppression of speech "for mere convenience."[24] For a content neutral speech restriction—such as the Ordinance—"to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"[25] Unlike a content-based speech restriction, the Ordinance "'need not be the least restrictive or least intrusive means of' serving the government's interests."[26] Rather, the First Amendment prohibits the government from regulating speech in a way that would allow a substantial burden on speech to fall in an area that "does not serve to advance its goals."[27]

The Supreme Court's decision in *McCullen v. Coakley* offers a useful starting point for our analysis. There, the Massachusetts legislature amended its Reproductive Health Care Facilities Act to address protests outside of abortion clinics. The amended Act made it a crime to knowingly stand on a "public way or sidewalk" within thirty-five feet of the entrance or driveway to any facility where abortions were performed.[28] In nearly all material respects, the amended Act was identical to the Ordinance before us, except the Massachusetts law established a thirty-five foot buffer zone and the Ordinance establishes an eight-foot buffer zone. This is a substantial distinction that the District Court did not

---

[22] *Bruni*, 824 F.3d at 363–64 (internal quotation marks omitted) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994)).

[23] *McCullen*, 573 U.S. at 486.

[24] *Id.*

[25] *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

[26] *Id.* (quoting *Ward*, 491 U.S. at 798)).

[27] *Id.* (internal quotation marks omitted) (quoting *Ward*, 491 U.S. at 799)).

[28] Mass. Gen. Laws, ch. 266 § 120E½ (2012).

adequately discuss in relying upon *McCullen* to support its order granting summary judgment to Turco.[29] Nor did the District Court fully appreciate the difference between the presence of demonstrable alternatives in *McCullen* and the evidence on this record that explains why less restrictive means were not likely to serve the City's interests here.

In *McCullen*, a sidewalk counselor (McCullen), sued to enjoin enforcement of a Massachusetts statute that made it a crime to stand within thirty-five feet of the entrance of any place where abortions were performed. Following a trial based on a stipulated record, the district court denied her challenge, the Court of Appeals for the First Circuit affirmed, and the Supreme Court granted certiorari.

After concluding that the Act was a content-neutral restriction on speech in a traditional public forum (sidewalks), the Court declared the statute unconstitutional. The Court's holding was based on the fact that "[t]he buffer zones burden substantially more speech than necessary to achieve [Massachusetts's] asserted interest[]."[30] The Court began its narrow-tailoring analysis by identifying the interests at stake. It noted that the buffer zones "clearly serve" the "government interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'"[31]

But the zones also placed "serious burdens" on the counselors' speech interests.[32] The thirty-five foot buffer zones resulted in a heavy burden on "one-on-one communication," which is the sidewalk counselors' preferred

---

[29] *See Turco*, 2017 WL 5479509, at *5 n.3 (noting only that "the size of the buffer zone is not dispositive because [Englewood] has failed to meet its burden and show that the Ordinance is narrowly tailored to serve a legitimate governmental interest").

[30] *McCullen*, 573 U.S. at 490.

[31] *Id.* at 486–87 (quoting *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997)).

[32] *Id.* at 487.

method of speech.[33] Imposing such a burden on that type of speech demands particular constitutional protection because it is "the most effective, fundamental, and perhaps economical avenue of political discourse."[34] Similarly, leafleting in support of controversial viewpoints is the "essence of First Amendment expression."[35] Accordingly, "[n]o form of speech is entitled to greater constitutional protection."[36] In sum, the Court concluded that government-imposed burdens on one-on-one communication, such as those imposed by the Massachusetts statute, implicated particularly significant First Amendment concerns.[37]

Moreover, the Massachusetts buffer zones carved out "a significant portion of the adjacent public sidewalks" and required the counselors to stand "well back" from the clinic.[38] The Court identified "uncontradicted testimony" that showed the buffer zones prohibited McCullen and her colleagues from effectively engaging in sidewalk counseling either verbally or by handing literature to the patients.[39] As a result, the zones significantly impacted McCullen's ministry.[40] McCullen estimated that she had been able to persuade eighty women to refrain from having abortions since the Act was amended to create the thirty-five foot buffer zone, but that this figure was "far fewer people" than she previously reached.[41] Jean Zarella,

---

[33] *Id.* at 488 (internal quotation marks omitted) (quoting *Meyer v. Grant*, 486 U.S. 414, 424 (1988)).

[34] *Id.* (internal quotation marks omitted) (quoting *Meyer*, 486 U.S. at 424)).

[35] *Id.* at 489 (internal quotation marks omitted) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)).

[36] *Id.* at 489 (internal quotation marks omitted) (quoting *McIntyre*, 514 U.S. at 347); *see also Schenk*, 519 U.S. at 377 ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment.").

[37] *Id.*

[38] *Id.* at 487.

[39] *Id.* at 487–88.

[40] *Id.* at 487.

[41] *Id.*

another petition in *McCullen*, described a far more dramatic affect of the Massachusetts Act. Before its passing, she stated that she had an estimated one-hundred "successful interactions." After its enactment, the buffer zones prevented her from persuading a single patient. [42]

The Court in *McCullen* rejected the government's contention that it had tried other approaches to address the hostile sidewalk protestors, but that such approaches were ineffective. Instead, the Court concluded that "the Commonwealth [of Massachusetts had] too readily foregone options that could [have] serve[d] its interests just as well, without substantially burdening the kind of speech in which [the sidewalk counselors] wish[ed] to engage."[43] It noted that Massachusetts had not initiated criminal prosecutions for existing laws that the hostile protestors could have been construed to have violated.[44] It also had not sought injunctions against the hostile group in the approximately twenty years leading up to the Act's amendment. "In short," the Court concluded, Massachusetts "ha[d] not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor ha[d] it shown that it considered different methods that other jurisdictions have found effective."[45]

Even though the District Court failed to fully appreciate the distinctions between *McCullen* and this case, the Court here did fully appreciate the extent to which *McCullen* should inform its inquiry into the constitutionality of the Ordinance. The background giving rise to the buffer zone in Massachusetts and that which prompted the City of Englewood to enact the buffer zone here are similar. The competing interests are identical. Except for the size of the prescribed buffer zones, the text of the two legislative enactments is nearly the same. In fact, if the record here included uncontradicted facts similar to those on the record in *McCullen*, then the Court's holding there would certainly dictate a similar outcome here. However, this record differs from the one in *McCullen* in two very important

---

[42] *Id.* at 487–88.

[43] *Id.* at 490.

[44] *Id.* at 494.

[45] *Id.*

ways. First, the buffer zones' exact impact on the sidewalk counselors' speech and the concomitant efficacy of their attempts to communicate is unclear on this record. Indeed, Turco admitted that she continued to speak with patients entering the clinic after the enactment of the buffer zones. At the very least, there is contradictory evidence regarding the extent to which the buffer zone prevented Turco from communicating her message as she wanted. Second, the record—properly viewed in the light most favorable to the City— established that the City considered and attempted to implement alternative means of regulating speech, and that the City did attempt to enforce existing laws before creating the buffer zone. Those measures failed. Accordingly, we cannot agree that Turco was entitled to judgment as a matter of law.

**A. The Buffer Zones' Impact on "Sidewalk Counselors."**

During discovery, Turco agreed that she could talk "to patients on some kind of regular basis both before and after [the] adoption of the buffer zone ordinance."[46] But she also stated that navigating the buffer zones was akin to traversing an "obstacle course."[47] Nevertheless, Turco testified that she was able to walk from one side of the entrance to the other,[48] even though an occasional snow bank or parked car sometimes imposed difficulties.[49]

Similarly, Rosemary Garrett, who also refers to herself as "a sidewalk counselor," testified that she was still able to help women even after the buffer zones were implemented.[50] Specifically, she stated in her deposition that she "wasn't bothered by the new buffer zone" because it did not affect her ministry.[51] In fact, she stated that her counseling efforts were thwarted only when the hostile protestors began "yelling and screaming" and displaying "disturbing pictures."[52] When that happened, the women began running into the clinic to avoid

---

[46] JA 222–23.

[47] JA 224.

[48] JA 224.

[49] JA 225.

[50] JA 135.

[51] JA 134.

[52] JA 135–36.

the protests, which prevented the sidewalk counselors from approaching the women and offering help.[53] According to Garrett, it was the "aggressive" actions of the anti-abortion protestors—not the buffer zones—that lead her to stand at the far corner from the entrance of the facility in order to conduct her ministry.[54]

Thus, on this record, we cannot say that the eight-foot buffer zone imposed an inappropriate burden on speech as a matter of law. Moreover, such a conclusion would be directly at odds with the Supreme Court's decision in *Hill v. Colorado*.[55] There, the Court considered whether a Colorado statute that regulated speech within 100 feet of a health care facility violated the First Amendment. Specifically, the statute made it "unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person."[56] The statute made it "more difficult [for sidewalk counselors] to give unwanted advice, particularly in the form of a handbill or leaflet, to persons entering or leaving medical facilities."[57]

Some of those who referred to themselves as "sidewalk counselors" sued Colorado, alleging that the statute violated the First Amendment. After the Colorado state courts denied the challenge, the Supreme Court granted certiorari.

As in *McCullen*, the Court began its analysis by discussing the interests at stake, finding that the plaintiffs' "First Amendment interests . . . [were] clear and undisputed" because, *inter alia*, "the public sidewalks, streets, and ways affected by the statute [were] 'quintessential' public forums for

---

[53] JA 135, 137.
[54] JA 137–38.
[55] 530 U.S. 703 (2000).
[56] *Hill*, 530 U.S. at 707 (quoting Colo. Rev. Stat. § 18-9-122(3) (1999)).
[57] *Id.* at 708.

14

free speech" and the plaintiffs' ability to communicate was "unquestionably lessened" by the Colorado statute.[58]

Concomitantly, the Court noted that the state had an interest in protecting the health and safety of its citizens, which "may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests."[59] Moreover, the Court noted that "rules that provide specific guidance to enforcement authorities serve the interest in evenhanded application of the law."[60] Finally, the Court found that it was important to distinguish between "state restrictions on a speaker's right to address a willing audience and those [restrictions] that protect listeners from unwanted communication."[61] It noted that the First Amendment protected a speaker's "right to attempt to persuade others to change their views," but "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it."[62] The Court explained the reasonableness and necessity for the eight foot buffer zone as follows:

> The statute seeks to protect those who wish to enter health care facilities, many of whom may be under special physical or emotional stress, from close physical approaches by demonstrators . . . . [T]he statute's prophylactic aspect is justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization

---

[58] *Id.* at 714–15.

[59] *Id.* at 715 (citation omitted) (citing *Madsen*, 512 U.S. at 753).

[60] *Id.*

[61] *Id.* at 715–16.

[62] *Id.* at 716 (citation omitted).

(as harassing or not harassing) of each individual movement within the 8-foot boundary. Such individualized characterization of each individual movement is often difficult to make accurately. . . . [T]he 8-foot restriction on an unwanted physical approach leaves ample room to communicate a message through speech. Signs, pictures, and voice itself can cross an 8-foot gap with ease.[63]

Given the record in *Hill*, the statute satisfied the Court's narrow tailoring analysis. It found that the eight-foot buffer zone between speakers and passersby did not greatly affect communications.[64] Clinic patients were still able to read signs,[65] sidewalk counselors could conduct conversations in a normal tone,[66] and the buffer zone allowed a leafleteer to stand "near the path of oncoming pedestrians [while] proffering his or her material, which the pedestrians [could] easily accept."[67] The District Court did not explain why the eight-foot buffer zone here was unconstitutional despite the Supreme Court's conclusion that the eight-foot buffer zone in *Hill* passed constitutional muster. In fact, the District Court did not even cite *Hill*.

---

[63] *Id.* at 729

[64] *Id.* at 726.

[65] *Id.* ("The 8-foot separation between the speaker and the audience should not have any adverse impact on the readers' ability to read signs displayed by demonstrators.").

[66] *Id.* at 726–27 ("[T]his 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" (quoting *Schenk*, 519 U.S. at 377)).

[67] *Id.* at 727. The Court allowed that the "8-foot interval could hinder the ability of a leafletter to deliver handbills to some unwilling recipients." *Id.* Ultimately, it found that the Colorado restriction adequately protected the rights of the counselors to convey their message.

Given the Court's analysis in *Hill*, we simply cannot conclude that the eight-foot buffer zones established under the Ordinance posed a severe burden on speech, and the record is clearly inadequate to support such a conclusion as a matter of law. Rather, we conclude that there are material issues of genuine fact regarding the extent to which Turco retained the ability to communicate despite enactment of the eight-foot buffer zone.

## B. Less Restrictive Alternatives.

We also disagree with the District Court's conclusion that the record shows that the City failed to consider less restrictive means of regulating speech in front of the clinic. To be sure, the District Court was clearly correct when it found that the City had not "prosecute[d] any protestors for activities taking place on the sidewalk" and "did not seek injunctive relief against individuals whose conduct was the impetus for the Ordinance."[68] Those facts are not disputed.

However, the City and its representatives explained that it had attempted to increase police presence at the Clinic, had considered alternative means of bringing order to the sidewalk, and proffered reasonable explanations for why those and other means were ineffective. The former Chief of Police, Arthur O'Keefe, testified that, given the limitations of "manpower" and the need to be able to deploy officers in response to emergencies such as drive-by shootings, it was not feasible to permanently provide a significantly increased police presence at the clinic.[69] He also stated that some off-duty officers worked at the clinic, but that the police department had "finite resources" and much of it was devoted to violent crime.[70] Accordingly, he could not "simply dedicate an officer four hours at a time every day to enhance their security."[71]

During her deposition, Lynn Algrant, the President of Englewood City Council, testified extensively about the alternative means that the Council considered and why they were ineffective. She stated that the City had attempted to

---

[68] *Turco*, 2017 WL 5479509, at *5.

[69] JA 207.

[70] JA 207.

[71] *Id.*

17

increase police presence at the clinic on a volunteer basis, but officers were not signing-up for any shifts.[72] She also testified that, despite manpower restrictions, on-duty officers were regularly dispatched to the clinic, but the hostile protests would resume as soon as the officers left.[73] Algrant said that she encouraged the clinic to seek an injunction or file criminal complaints, but those efforts were hampered because the clinic escorts feared for their safety.[74] She recalled occasions where clinic escorts were so frightened that they became "hysterical,"[75] yet they still refused to file complaints because of the threat of retaliation from the hostile protestors. The safety concerns were not unwarranted. One of the women at the clinic found a picture of herself on the internet inside of a bullseye, and as a result, the clinic escorts "were extremely protective of their privacy and extremely protective for their safety."[76]

Timothy Dacey, the City Manager for Englewood, supported Algrant's testimony. He believed that "it [would have been] cost prohibitive for [the City] to provide security for the clinic."[77] Dacey also stated that the police department's policy prohibited them from providing individual security coverage to private businesses.[78] He also testified that an increase in police patrols in the area were ineffective, and that the clinic escorts were too fearful to make complaints.[79] Chief O'Keefe confirmed this in his testimony, stating that some of the targets of the protestors' ire gave their names, but "many other people that were involved in incidents did not" because they were "concerned about subsequent identification or . . . were emotionally too distraught to become involved further."[80]

---

[72] JA 54.

[73] JA 55, 58–59.

[74] JA 60, 64.

[75] JA 75.

[76] JA 64.

[77] JA 86.

[78] JA 87.

[79] JA 88–89.

[80] JA 205.

18

This fear was also borne out by the deposition testimony from clinic escorts and through e-mails between the escorts and City officials. One clinic escort testified that "antiabortion groups [were] notorious for finding out people's personal information, whether patients or abortion providers or escorts" and using it to further target their acts of harassment.[81] She stated that her colleagues "have had antiabortion protesters show up at their place of work, their houses, [and] put their phone numbers and addresses and personal information and photos on websites."[82] As a result, the clinic escorts were "very careful to not let the protestors get any of our personal information" and used nicknames for each other while conversing on the sidewalk.[83] The sidewalk escort testified that she was concerned about the Bread of Life's apparent affiliation with a "fringe antiabortion group[]," Abolish Human Abortion.[84] That group was itself aligned with "domestic terrorists" and "clinic bombers."[85] She also testified that the Bread of Life protestors were aligned with "Operation Rescue" a group that also aligned itself "with clinic bombers and celebrate[d] the murders of abortion doctors."[86]

That same clinic escort submitted a certification which included as exhibits several detailed accounts of the chaotic sidewalk environment that had developed outside of the clinic.[87] She noted that the Bread of Life protestors filmed the patients' license plates when they parked their cars, but she was unsure what they did with the information.[88] She also stated that the hostile protests had escalated to a point that included "repeated physical assaults of escorts."[89]

In summary, the testimony of the various stakeholders when properly viewed in the light most favorable to the City

---

[81] JA 145.
[82] JA 145.
[83] JA 145.
[84] JA 146.
[85] JA 146.
[86] JA 146.
[87] JA 166.
[88] JA 181.
[89] JA 179.

demonstrated that the City considered alternative means of restricting speech around the clinic. A jury could find that financial restraints and fear of reprisal prevented these measures from being effective. We therefore hold that this record was not appropriate for summary judgment.

**C. Our Decision in *Bruni*.**

Our decision here is consistent with our earlier decision in *Bruni*.[90]  There, we considered whether a Pittsburgh Ordinance that established fifteen-foot buffer zones around all health care facilities violated the First Amendment. That ordinance read:

> No person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen (15) feet from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.[91]

We noted that, on its face, this statute applied to all hospitals and health care facilities in Pittsburgh.[92] However, the City had only ever demarcated two buffer zones, both in front of facilities that provided abortion services.[93]  A group of persons who wanted to communicate with women entering the clinics sued the City of Pittsburgh, claiming that the ordinance

---

[90] 824 F.3d 353 (3d Cir. 2016).
[91] Pittsburgh Pa., Code § 623.04.
[92] *Bruni*, 824 F.3d at 358.
[93] *Id.*

violated the First Amendment.[94] They also sought a preliminary injunction.[95] Following a hearing on the injunction, the District Court granted Pittsburgh's motion to dismiss the complaint. The plaintiffs appealed and we reversed.

We held that the District Court erred by dismissing the plaintiffs' complaint and remanded for further factual development. Specifically, we found that allegations in the complaint suggested that the burden imposed on speech was akin to that in *McCullen*.[96] The plaintiffs alleged that the buffer zone prevented them from reaching their intended audience and made conversations with the clinic's patients much more difficult.[97] Because the case was still at the pleading stage, those allegations were sufficient to require the government to prove "either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason."[98] We noted that Pittsburgh could not simply forego the range of alternatives available to it "without a meaningful record demonstrating that those options would fail to alleviate the problems meant to be addressed."[99] Finally, *Bruni* emphasized the "rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis," and cautioned that the facts developed as the proceedings commenced would ultimately decide whether the restriction was justified.[100]

Although *Bruni* arose at the pleading stage and the case before us was resolved through a motion for summary judgment, *Bruni* is instructive because it highlights the intensely factual nature of the inquiry that is usually needed to resolve disputes arising from imposition of buffer zones such as this one. We emphasized that "the constitutionality of buffer zone laws turns on the factual circumstances giving rise to the

---

[94] *Id.* at 359.
[95] *Id.*
[96] *Id.* at 369.
[97] *Id.*
[98] *Id.* at 370.
[99] *Id.* at 371.
[100] *Id.* at 372–73.

law in each individual case—the same type of buffer zone may be upheld on one record where it might be struck down on another."[101]

This record contains a multitude of contradicting factual assertions. Some facts suggest that the buffer zones imposed a significant restraint on the plaintiff's ability to engage in constitutionally-protected communication. Others support Englewood's position that the buffer zones hardly affected plaintiff's ability to reach her intended audience. Some facts support plaintiff's argument that the City had foregone less-restrictive options to address the chaotic environment outside of the clinic. Others show that Englewood considered these options and reasonably rejected them or found them to be ineffective.[102] In short, the record does not conclusively demonstrate that either party is entitled to summary judgment on the narrow tailoring claim.

## D. Overbreadth.

We also find that the District Court erred in finding that the ordinance was overbroad. Englewood correctly argues that the District Court's reliance on *McCullen* was misplaced. There, the Supreme Court explicitly stated that it did not "need [to] consider [the] petitioners' overbreadth challenge" because it found that Massachusetts's statute was not narrowly tailored.[103] In relying on *McCullen*, the District Court seems to have conflated the narrow-tailoring analysis with the overbreadth analysis.[104] To support its conclusion that the Ordinance was overbroad, the District Court stated: "To meet the narrowly-tailored requirement, Defendant must create an Ordinance that targets the exact wrong it seeks to remedy."[105]

---

[101] *Id.* at 357.

[102] Turco characterized the "the unwillingness of witnesses to come forward with complaints about criminal behavior [as] . . . preeminently a matter of factual dispute" in her pleadings. (Docket #45, 10).

[103] *McCullen*, 573 U.S. at 496 n.9.

[104] JA 11.

[105] JA 11 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy.")).

Although overbreadth and narrow tailoring are related,[106] the Supreme Court has rejected the District Court's assertion that an Ordinance must precisely target the acts it was passed to remedy.[107]

In *Hill*, the Supreme Court held that "[t]he fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance. What is important is that all persons entering or leaving health care facilities share the interests served by the statute."[108] When a buffer zone broadly applies to health care facilities, we may conclude "the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive."[109]

*Bruni* also discussed the plaintiffs' allegation that the statute was overbroad because it authorized creation of buffer zones at non-abortion related locations.[110] We declined to find that the ordinance was facially unconstitutional without further development in the record. We reiterated the Supreme Court's admonition in *Hill* that the comprehensiveness of a statute demonstrates a lack of discriminatory motive and is not constitutionally determinative.[111] Ultimately, in *Bruni* we concluded that we could not assess the breadth of the ordinance absent a "well-supported conclusion" about how widely it swept.[112] We also reiterated the "broad principle of deference to legislative judgments" and that a legislative body "need not meticulously vet every less burdensome alternative."[113] This principle is well-established in First Amendment jurisprudence, and we are mindful of our duty to "accord a

---

[106] *See Bruni*, 824 F.3d at 374 ("It is true that the breadth of the challenged law plays a role in the narrow-tailoring analysis of the Plaintiffs' free speech claim." (citations omitted)).

[107] *Hill*, 530 U.S. at 730–31.

[108] *Id.*

[109] *Id.* at 731.

[110] *Bruni*, 824 F.3d at 373–74.

[111] *Hill*, 530 U.S. at 731.

[112] *Bruni*, 824 F.3d at 374.

[113] *Id.* at 370 n.18.

measure of deference to the judgment" of Englewood city council.[114]

We conclude that the District Court erred in granting summary judgment because the ordinance was not overbroad. Courts may not strike down a regulation as "overbroad unless the overbreadth is substantial in relation to the [regulation's] plainly legitimate sweep."[115] The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*."[116] The hesitation to label a statute overbroad arises from a court's need to strike a balance between competing social costs:

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects."[117]

"In determining whether a statute's overbreadth is substantial, we consider a statute's application to real-world conduct, not fanciful hypotheticals."[118] "[T]he overbreadth claimant bears the burden of demonstrating, 'from the text of [the law], *and from actual fact*,' that substantial overbreadth exists."[119]

---

[114] *Hill*, 530 U.S. at 727.

[115] *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241 (3d Cir. 2010) (alteration in original) (internal quotation marks and citations omitted).

[116] *United States v. Stevens*, 559 U.S. 460, 485 (2010) (emphasis in original).

[117] *McCauley*, 618 F.3d at 241 (quoting *United States. v. Williams*, 553 U.S. 285, 292 (2008)).

[118] *Stevens*, 559 U.S. at 485 (citations omitted).

[119] *Id.* (alteration in original) (emphasis in original) (quoting *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)).

The same concern is present here. The record is essentially devoid of any factual development concerning the "legitimate sweep" of the buffer zones. We therefore "think it unwise for us to assess the proper scope of the City's Ordinance without there first being a resolution of the merits of the Plaintiffs' free speech claim."[120] Accordingly, we will also reverse the District Court's grant of summary judgment on grounds that the statute was overbroad.

## III.

For the foregoing reasons, the District Court's order granting summary judgment is hereby reversed, and the case remanded for proceedings consistent with this opinion.

---

[120] *Bruni*, 824 F.3d at 374.