**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1084
_____


NIKKI BRUNI; JULIE COSENTINO;
CYNTHIA RINALDI; KATHLEEN LASLOW;
PATRICK MALLEY,
Appellants

v.

CITY OF PITTSBURGH; PITTSBURGH CITY COUNCIL;
MAYOR PITTSBURGH
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-14-cv-01197)
Honorable Cathy Bissoon, U.S. District Judge
_____


Argued: February 6, 2019

Before: HARDIMAN, KRAUSE, and GREENBERG, *Circuit Judges*

(Opinion Filed: October 18, 2019)

Kenneth J. Connelly
Elissa M. Graves
Kevin H. Theriot          [ARGUED]
Kristen K. Waggoner
David A. Cortman
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, AZ 85260

Lawrence G. Paladin, Jr.
Suite 6C
15 Duff Road
Pittsburgh, PA 15235

>        *Counsel for Plaintiff-Appellants Nikki Bruni, Julie
>        Cosentino, Cynthia Rinaldi, Kathleen Laslow, and
>        Patrick Malley*

Julie E. Koren
Matthew S. McHale*          [ARGUED]
Yvonne S. Hilton
City of Pittsburgh
Department of Law
414 Grant Street
313 City County Building
Pittsburgh, PA 15219

---

     * Matthew S. McHale withdrew as counsel on July 3, 2019, prior to the issuance of this opinion.

*Counsel for Defendant-Appellees City of Pittsburgh*,
*Pittsburgh City Council*, *Mayor Pittsburgh*

William A. Bonner, I
12 Veterans Square
P.O. Box 259
Media, PA 19063

*Counsel for Amicus Curiae Life Legal Defense
Foundation*

Jamie Cohn
Stephen M. Juris
Janice Mac Avoy
Fried Frank Harris Shriver & Jacobson
One New York Plaza
New York, NY 10004

Susan J. Frietsche
Women's Law Project
Western Pennsylvania Office
428 Forbes Avenue
Suite 1710
Pittsburgh, PA 15219

*Counsel for Amici Curiae Women Law Project*,
*National Abortion Federation*

Stephen M. Crampton
P.O. Box 4506
Tupelo, MS 38803

*Counsel for Amici Curiae Pro Life Action League,*
*Sidewalk Advocates for Life*

Steven W. Fitschen
The National Legal Foundation
524 Chesapeake
Chesapeake, VA 23322

*Counsel for Amici Curiae Pacific Justice Institute,*
*Concerned Women for America, National Legal*
*Foundation*

Matthew D. Staver
Horatio G Mihet
Roger K. Gannam
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854

*Counsel for Amici Curiae Colleen Reilly* and *Becky*
*Biter*

Erek L. Barron
Whiteford Taylor & Preston
111 Rockville Pike
Suite 800
Rockville, MD 20850

*Counsel for Amicus Curiae International Municipal*
*Lawyers*

————————————

## OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

This case requires us to determine the constitutionality of a Pittsburgh ordinance that creates a fifteen-foot "buffer zone" outside the entrance of any hospital or healthcare facility. Pittsburgh, Pa., Code § 623.04 (2005) [hereinafter "the Ordinance" or "Pitts. Code"]. In relevant part, the Ordinance states that "[n]o person or persons shall knowingly congregate, patrol, picket or demonstrate" in the prescribed zone. *Id.* Outside of a Planned Parenthood in downtown Pittsburgh, Plaintiffs engage in leafletting and "peaceful . . . one-on-one conversations" conducted "at a normal conversational level and distance" intended to dissuade listeners from obtaining an abortion. Appellants' Br. 9, 17–18. As the City has asserted that the Ordinance applies to this speech, known as "sidewalk counseling," Plaintiffs argue that the Ordinance is facially unconstitutional under the First Amendment and the District Court erred in granting summary judgment in the City's favor. Because we conclude that the Ordinance does not cover sidewalk counseling and thus does not impose a significant burden on speech, we will affirm.

5

## I. Background

### A. Factual Background[1]

#### 1. History of the Ordinance

In the mid- and late 1990s, Planned Parenthood was the site of numerous clashes between opponents and advocates of abortion rights as well as individuals seeking the facility's services.[2]  In addition to seeing "hundreds" of people at the facility on a Saturday—"pro and anti"—the clinic was plagued by bomb threats, vandalism, and blockades of its entrance.  JA 322a.  To address these incidents, the Bureau of Police deployed an overtime detail of "up to ten officers and a sergeant" to maintain order and security, often using crowd-control barriers to separate demonstrators from each other and from patients trying to enter the clinic.  JA 1024a.

---

[1] The background summarized here is drawn from the record and our prior opinion in this case, *Bruni v. City of Pittsburgh* (*Bruni I*), 824 F.3d 353, 357–59 (3d Cir. 2016). Because we are reviewing a district court's grant of summary judgment, we consider the facts in the light most favorable to the non-movants and draw all reasonable inferences in their favor.  *See Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 266–67 (3d Cir. 2005).

[2] The same was true of Allegheny Reproductive Health Center, another clinic that provides abortions, which, in addition to seeing hundreds of protestors, was fire bombed, intentionally flooded, and had its windows shot out.

6

In 2002, Planned Parenthood moved to its current location at 933 Liberty Avenue. Although the incidents lessened in severity, contemporaneous police logs and testimony from Sergeant William Hohos indicate that "the pushing," "the shoving," and "the blocking of the doors" continued, and the overtime detail, reduced in size, continued to provide a police presence. JA 323a, JA 834a, JA 837a. After Pittsburgh was declared a financially distressed municipality in late 2003, however, fiscal constraints and the need for redeployment of limited police resources required the detail to be discontinued, and police were called to address the continuing incidents at the site on an as-needed basis. In the wake of the detail's discontinuation, the clinic reported an "obvious escalation in the efforts of the protestors," JA 357a, including an increase in "aggressive pushing, shoving and . . . harassing behavior that included shoving literature into people's pockets, hitting them with signs and blocking their entrance into the building," JA 352a.

In November 2005, the City Council held hearings on proposed legislation that eventually resulted in the Ordinance. Among those who testified were sidewalk counselors, clinic escorts, patients, and other concerned members of the community. Several witnesses insisted the Ordinance was unnecessary either because they had never observed violent incidents or were unaware of "significant violence" outside the clinic. JA 348a. But other witnesses reported being personally harassed and prevented from entering the clinic, being yelled at through the glass doors of the clinic, and seeing patients being surrounded on the sidewalk. A Planned Parenthood counselor described patients entering the clinic in a "psychological state [of] situational crisis," threatening their health. JA 355a. And "without [police] supervision," the

7

President and CEO of Planned Parenthood of Western Pennsylvania said, "there ha[d] been an increase in unlawful behavior that . . . put[] . . . patients, their families, pedestrians and . . . protestors at risk." JA 352a.

The City Council also heard from Commander Donaldson of the Pittsburgh Police Department. He reported that police had been summoned to Planned Parenthood twenty-two times in the past six months alone to "mediate confrontations" and respond to incidents ranging from signs "obstructing the front of the building" to protestors "follow[ing] . . . people to the doorway." JA 404a. They had not made any arrests, however. According to Commander Donaldson, the City had on its books "laws . . . that would address obstructing traffic or passageways or . . . the [clinic's] doorway," but those laws would not address the precise problem that was occurring, namely attempts to block people from entering the facility before they reached its front door.[3] JA 398a.

The debate on the Ordinance was extensive. Many witnesses, both for and against the legislation, expounded on the competing interests at stake and expressed a desire to protect both free speech and access to healthcare, including abortions.

---

[3] The City's designated representative, who had been a member of the overtime detail before it was disbanded, likewise attested that the criminal laws were not adequate to deal with protestors and demonstrators outside the clinic because the obstructive conduct "[wasn't] rising to those levels. It was all the underlying stuff in between." JA 1057a.

## 2.     The Ordinance

Shortly after these hearings, the City Council adopted the Ordinance, and the mayor signed it into law. *See Bruni v. City of Pittsburgh* (*Bruni I*), 824 F.3d 353, 357 (3d Cir. 2016). Codified as Chapter 623 of the Pittsburgh Code of Ordinances, the Ordinance states, in relevant part:

> No person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending 15 feet from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers . . . in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.[4]

Pitts. Code § 623.04. The Council also ratified a preamble that set forth the City's goals in adopting the Ordinance, including

---

[4] Although the Chapter does not define "health care facility," a "[m]edical [o]ffice/[c]linic" is defined as "an establishment providing therapeutic, preventative, corrective, healing and health-building treatment services on an out-patient basis by physicians, dentists and other practitioners." Pitts. Code § 623.02. Penalties for violating the Ordinance range from a $50 fine for a first offense to a thirty-day maximum (and three-day minimum) jail sentence for a fourth violation within five years. *Id.* § 623.05.

9

"provid[ing] unobstructed access to health care facilities" and "medical services," "avoid[ing] violent confrontations," "provid[ing] a more efficient and wider deployment" of City services, and "ensuring that the First Amendment rights of demonstrators to communicate their message . . . [are] not impaired." *Id.* § 623.01.

As originally passed, the Ordinance also included an "[e]ight-foot personal bubble zone," extending one hundred feet around clinics, in which people could not be approached without their consent "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling." *Id.* § 623.03. Following a facial challenge to the Ordinance, we concluded that the Ordinance was content neutral and each zone was constitutionally permissible but the combination of the two zones was not. *See Brown v. City of Pittsburgh*, 586 F.3d 263, 273, 276–81 (3d Cir. 2009). On remand, the City chose to abandon the floating bubble zone and retain only the fixed buffer zone that prohibited "congregat[ing], patrol[ling], picket[ing] or demonstrat[ing]." Pitts. Code § 623.04. That choice was effectuated by the District Court, which permanently enjoined the bubble zone and required the City to demarcate any fixed buffer zone prior to enforcement.[5]

---

[5] The injunction also required that the buffer zone be construed to prohibit "any person" from "picket[ing] or demonstrat[ing]" within the zone, including those allowed to enter the zone pursuant to their official duties. *See Brown*, 586 F.3d at 275.

10

### 3. Application of the Ordinance and Plaintiffs' Activities

Today, the City has demarcated buffer zones at two locations, both of which provide reproductive health services including abortions. *Bruni I*, 824 F.3d at 358. Plaintiffs Nikki Bruni, Cynthia Rinaldi, Kathleen Laslow, Julie Cosentino, and Patrick Malley engage in the bulk of their anti-abortion activities outside the buffer zone at Planned Parenthood. *See id.* at 359. In contrast to the conduct that gave rise to the Ordinance, Plaintiffs do not physically block patients' ingress or egress or engage in violent tactics. Instead, they engage in what they call "sidewalk counseling," meaning "calm" and "quiet conversations" in which they "offer assistance and information to" women they believe are considering having an abortion "by providing them pamphlets describing local pregnancy resources, praying, and . . . peacefully express[ing] [a] message of caring support."[6] JA 59a; *see* Appellants' Br. 9. That message, Plaintiffs explain, "can only be communicated through close, caring, and personal

---

[6] We will use the term "sidewalk counseling" in this opinion with the meaning given to it by Plaintiffs. By contrast, the title "sidewalk counselor" has sometimes been claimed by those who engage in "'in your face' yelling . . . pushing, shoving, and grabbing" consistent with aggressive demonstration. *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 363 (1997). As Plaintiffs here have explained, however, such conduct does not constitute sidewalk counseling as they use the term and is "counter-productive to [their] message of kindness, love, hope, gentleness, and help." JA 574a.

conversations, and cannot be conveyed through protests." JA 62a. Nonetheless, the City takes the position that Plaintiffs' sidewalk counseling falls within the prohibition on "demonstrating"—if not "congregating," "patrolling," and "picketing" too, *see* JA 334a–37a—so while they can engage in sidewalk counseling outside the zone, they cannot once within its bounds. *See Bruni I*, 824 F.3d at 359.

Plaintiffs describe various ways that the buffer zone has hindered their ability to effectively communicate their message. The street noise makes it difficult for people to hear them, forcing them to raise their voices in a way inconsistent with sidewalk counseling. And at the distance at which they are forced to stand, they are unable to differentiate between passersby and individuals who intend to enter the facility, causing them to miss opportunities to engage with their desired audience through either speech or leafleting.

In addition to "sidewalk counseling," Plaintiff Nikki Bruni is the local leader of a group participating in the "Forty Days for Life" movement, a global anti-abortion campaign.[7] Twice a year, campaign participants, including Plaintiffs, pray outside of abortion clinics from 7 AM to 7 PM continuously for forty days. They do so in shifts, and many participants wear

---

[7] The movement describes its mission as "to bring together the body of Christ in a spirit of unity during a focused 40 day campaign of prayer, fasting, and peaceful activism, with the purpose of repentance, to seek God's favor to turn hearts and minds from a culture of death to a culture of life, thus bringing an end to abortion." *Bruni v. City of Pittsburgh*, 283 F. Supp. 3d 357, 363 (W.D. Pa. 2017).

12

or carry signs. As the leader of the group, Bruni organizes local churches to ensure people are always outside of the clinic so "there's always groups on the sidewalk present during the 40 Days all day every day." JA 141a. Although the exact number of participants is disputed, the record reflects a daily presence of somewhere between ten and forty people.

## B.    Procedural Background

About five years after we upheld the buffer-zone component of the Ordinance in *Brown* as a content-neutral time, place, and manner regulation, the Supreme Court decided *McCullen v. Coakley*, striking down as insufficiently narrowly tailored a Massachusetts law that created a thirty-five-foot buffer zone in front of health facilities where abortions were performed. 573 U.S. 464, 493–97 (2014). The Court found the law "extreme," *id.* at 497, and "truly exceptional," *id.* at 490: although congestion occurred at one clinic in one city once a week, the law applied statewide to all reproductive health facilities and, with few exceptions, prohibited any person from even "standing" in the zone, *id.* at 480, 493. To justify this "significant . . . burden" on speech, *id.* at 489, the Court held, the government must "show[] that it seriously undertook to address the problem with less intrusive tools readily available to it," such as arrests, prosecutions, or targeted injunctions, or "that it considered different methods that other jurisdictions . . . found effective," *id.* at 494.

In light of *McCullen*, Plaintiffs filed a complaint, challenging the Ordinance, pursuant to 42 U.S.C. § 1983, under the First and Fourteenth Amendments. *Bruni I*, 824 F.3d at 359. The District Court granted the City's motion to dismiss

13

Plaintiffs' First Amendment claims, and Plaintiffs appealed.[8] *Id.* at 360.

We vacated the District Court's dismissal. *Id.* at 357, 373–74. Taking as true the complaint's allegations that the Ordinance had been enforced against Plaintiffs and had significantly hindered their speech, *id.* at 369, we concluded that the Ordinance "impose[d] a similar burden as that in *McCullen*," *id.* at 368 n.15, so that the City had the same obligation as in *McCullen* to demonstrate "either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason," *id.* at 370. We thus remanded for factfinding on these issues, as well as a determination about "the proper scope of the Ordinance." *Id.* at 357, 374. Notwithstanding our earlier holding as to content neutrality in *Brown*, 586 F.3d at 273, 275, 277, we also directed the District Court to consider whether the Ordinance should still be considered content neutral in light of

---

[8] Plaintiffs also filed a motion for a preliminary injunction to prevent the City from enforcing the Ordinance against them, which the District Court denied and Plaintiffs did not appeal. *Bruni I*, 824 F.3d at 359–60. In addition to dismissing Plaintiffs' First Amendment claims, the District Court granted the City's motion to dismiss Plaintiffs' Fourteenth Amendment Due Process Clause challenge, a decision we affirmed in *Bruni I* and that therefore is not on appeal here. *See id.* at 360, 374–75. Earlier in this litigation, Plaintiffs voluntarily dismissed their as-applied challenges to the Ordinance, their claim under the Equal Protection Clause, and their claim of selective enforcement against the mayor. *Id.* at 359 n.5.

14

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), the Supreme Court's most recent pronouncement on the dividing line between content-neutral and content-based restrictions. *Bruni I*, 824 F.3d at 365 n.14.

On remand, the District Court accepted the City's contention that the Ordinance covered Plaintiffs' sidewalk counseling as a form of demonstrating and held that the Ordinance was content neutral, even under *Reed*. *Bruni v. City of Pittsburgh*, 283 F. Supp. 3d 357, 361, 367–68 (W.D. Pa. 2017). It also distinguished the Ordinance from the statute in *McCullen* as creating a smaller buffer zone and allowing Plaintiffs to reach their audience through sidewalk counseling despite the buffer zone and therefore concluded that the Ordinance imposed "only a minimal burden on Plaintiffs' speech." *Id.* at 369–71. Accordingly, it held that the City "ha[d] no obligation to demonstrate that it tried—or considered and rejected"—the alternatives identified in *McCullen*, such as arrests or targeted injunctions, and even if the City did have such an obligation, it had been satisfied. *Id.* at 371–72. The Court therefore granted the City's motion for summary judgment. *Id.* at 373. This appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review a district court's grant or denial of summary judgment de novo, *see EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 448 (3d Cir. 2015), and may affirm on any basis supported by the record, *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is

15

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of a First Amendment claim, we "examine independently the facts in the record and 'draw our own inferences' from them." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002) (quoting *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 247 (3d Cir. 1998)). Like the District Court, however, we review the facts in the light most favorable to the nonmoving party. *See Hugh*, 418 F.3d at 267.

## III.    Discussion

On appeal, Plaintiffs argue that the Ordinance violates the Free Speech and Free Press Clauses[9] of the First Amendment for three reasons: first, the Ordinance is content based and therefore subject to strict scrutiny; second, even if it is content neutral, the Ordinance is not narrowly tailored and thus does not survive intermediate scrutiny; and third, the Ordinance is overbroad. After providing an overview of the general framework that guides our analysis, we address each of these arguments.

---

[9] For the reasons articulated in *Bruni I*, we treat Plaintiffs' free speech and free press claims together. *See* 824 F.3d at 373 ("Plaintiffs' free press claim is . . . properly considered a subset of their broader free speech claim, given that the Freedom of the Press Clause and the Free Speech Clause both protect leafleting from government interference.").

16

## A.     General Framework

Plaintiffs allege that the Ordinance is unconstitutional on its face. *See Bruni I*, 824 F.3d at 362. A facial challenge "seeks to vindicate not only [a plaintiff's] own rights," as in an as-applied challenge, but also "those of others who may . . . be adversely impacted by the statute in question." *Id.* (quoting *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 623 (3d Cir. 2013)). Although facial challenges in the First Amendment context are more forgiving than those in other contexts, *see United States v. Salerno*, 481 U.S. 739, 745 (1987), "all agree that a facial challenge [under the First Amendment] must fail where the statute has a plainly legitimate sweep," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citation omitted).

As we explained in *Bruni I*, however, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the . . . disposition in every case involving a constitutional challenge." 824 F.3d at 363 (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)). Courts therefore look to "[t]he relevant constitutional test" to resolve the inquiry, *id.* (citation omitted), bearing in mind that a party seeking to invalidate a law in its entirety bears a heavy burden, *see Wash. State Grange*, 552 U.S. at 450–51; *Brown*, 586 F.3d at 269.

Here, the relevant test is that governing free speech claims. The government's ability to restrict speech in a traditional public forum, such as a sidewalk, is "very limited." *McCullen*, 573 U.S. at 477 (citation omitted). That is because traditional public fora "are areas that have historically been open to the public for speech activities." *Id.* at 476. In such

17

fora, the government may not restrict speech based on its "communicative content," *Bruni I*, 824 F.3d at 364 (quoting *Reed*, 135 S. Ct. at 2226)—that is, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content," *id.* at 363 (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)).

By contrast, the government has greater leeway to regulate "features of speech unrelated to its content." *McCullen*, 573 U.S. at 477. Thus, "[e]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The level of scrutiny a court applies to a restriction on speech depends on whether it is content based or content neutral. If the restriction is content based, it is subject to strict scrutiny and is therefore "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226; *see McCullen*, 573 U.S. at 478. If a restriction is content neutral, "we apply intermediate scrutiny and ask whether it is 'narrowly tailored to serve a significant governmental interest.'" *Bruni I*, 824 F.3d at 363–64 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764

(1994)). The threshold question, therefore, is whether the restriction here is content based or content neutral.[10]

## B. Content Neutrality

Plaintiffs contend that the Ordinance is content based and thus subject to strict scrutiny because it regulates speech "based on subject matter, function, or purpose," rendering it content based under *Reed*.[11] Appellants' Br. 34. For the reasons that follow, we disagree.

---

[10] Although the parties begin their briefing with an application of intermediate scrutiny, we follow the Supreme Court's lead in *McCullen* by addressing first whether the Ordinance is content based because the answer to that question determines the correct level of scrutiny to apply. *See* 573 U.S. at 478–79.

[11] Plaintiffs make additional arguments in passing, but they are not persuasive. First, Plaintiffs contend that the City's purpose in adopting the Ordinance was to "target anti-abortion content" because the City Council's discussion about the Ordinance "centered entirely on abortion and the speech outside of abortion facilities in Pittsburgh." Appellants' Br. 40–41. But the Supreme Court explicitly rejected this argument in *McCullen*. *See* 573 U.S. at 481–82 ("States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist." (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion))). Second, Plaintiffs argue that the Ordinance is content based as applied because it is enforced only outside of reproductive health facilities and therefore affects only abortion-related speech. Plaintiffs did not make

In *Reed*, the Supreme Court considered the constitutionality of an ordinance that regulated the manner of display of outdoor signs depending on their subject matter. 134 S. Ct. at 2224–25. For example, the ordinance allowed "Political Signs" to be bigger in size and remain posted longer than those it defined as "Temporary Directional Signs." *Id.* at 2224–25, 2227. The Court held that the regulation was content based because the restrictions applied differently "depend[ing] entirely on the communicative content of the sign[s]." *Id.* at 2227. As relevant here, the Court noted that whereas "[s]ome facial distinctions . . . are obvious," such as "defining regulated speech by particular subject matter," others are more "subtle," such as "defining regulated speech by its function or purpose." *Id.*

The thrust of Plaintiffs' argument is that the Ordinance is content based because the City interprets the word "demonstrating" to apply to sidewalk counseling but not to peaceful one-on-one communication about other subjects, like sports teams, and, as a result, law enforcement must examine the content of any speech to determine if it is prohibited. However, despite the assumptions of both parties,[12] nothing in

this argument at summary judgment below, and it is therefore forfeited. *See Keenan v. City of Philadelphia*, 983 F.2d 459, 471 (3d Cir. 1992). In any event, "a facially neutral law does not become content based simply because it may disproportionally affect speech on certain topics." *McCullen*, 573 U.S. at 480. *Reed*, decided one year after *McCullen*, does not speak to these aspects of *McCullen*'s analysis.

[12] Although Plaintiffs contend that the City "enforces" the Ordinance "to suppress [their] leafletting and sidewalk

the plain language of the Ordinance supports a construction that prohibits peaceful one-on-one conversations *on any topic* or conducted *for any purpose* at a normal conversational volume or distance. In short, the Ordinance as written does not prohibit the sidewalk counseling in which Plaintiffs seek to engage within the zone.

No doubt, if the Ordinance by its terms did prohibit one-on-one conversations about abortion but not about other subjects within the zone, it would be highly problematic, *see Reed*, 135 S. Ct. at 2230, particularly where, as here, the speech alleged to be prohibited occurs on a public sidewalk and constitutes one-on-one "normal conversation and leafletting," *McCullen*, 573 U.S. at 488—"core political speech entitled to the maximum protection afforded by the First Amendment," *Bruni I*, 824 F.3d at 357. But under the doctrine of constitutional avoidance, "[i]t has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction

---

conversations" within the buffer zone, Appellants' Br. 17, the record does not reflect any prosecution, arrest, or even citation. Instead, it reflects that, except for isolated instances in which police were called to Planned Parenthood but took no action, Plaintiffs avoided the buffer zone based on an assumption, shared by the City, about the scope of the Ordinance. The realistic threat of the City's enforcement is sufficient for purposes of Plaintiffs' standing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). As we explain below, however, it does not preclude us under the doctrine of constitutional avoidance from adopting a narrowing construction of the Ordinance.

that would make it constitutional, it will be upheld."[13] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem.").

Of course, we may not "rewrite a . . . law to conform it to constitutional requirements," *United States v. Stevens*, 559 U.S. 460, 481 (2010) (citation omitted), but, as we have recognized on many occasions, "[i]n the absence of a limiting construction from a state authority, we must 'presume any narrowing construction or practice to which the law is fairly susceptible.'"[14] *Brown*, 586 F.3d at 274 (quoting *City of*

---

[13] As we said in *Brown*, "[t]his principle of interpretation is consistent with Pennsylvania law." 586 F.3d at 274 n.13 (citing *Commonwealth v. Monumental Props., Inc.*, 329 A.2d 812, 827 (Pa. 1974); and *Dole v. City of Philadelphia*, 11 A.2d 163, 168–69 (Pa. 1940)). And this is a particularly compelling case in which to apply the doctrine given the constitutional concerns inherent in restricting this kind of speech. As the Court explained in *McCullen*, "'one-on-one communication' is 'the most effective, fundamental, and perhaps economical avenue of political discourse.'" 573 U.S. at 488 (quoting *Meyer v. Grant*, 486 U.S. 414, 424 (1988)). Indeed, "[l]eafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment." *Id.* at 489 (quoting *Schenck*, 519 U.S. at 377).

[14] That is not to say that the City's interpretation of the Ordinance is irrelevant—it is a consideration in a court's

22

*Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988)); *see Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 n.10 (3d Cir. 2001) (explaining that where a state court has not authoritatively construed the terms of a stated policy, "we are . . . required to give it a reasonable narrowing construction if necessary to save it from unconstitutionality"); *see also*

---

determination of whether to adopt a limiting construction. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992); *see also Ward*, 491 U.S. at 795–96. But the City's interpretation has not been adopted by any Pennsylvania court, and where no state court has weighed in and the Ordinance is readily susceptible to a "reinterpretation" consistent with the Ordinance's text, the City's position is not dispositive. *Free Speech Coal., Inc. v. Attorney Gen. of the U.S.*, 677 F.3d 519, 539 (3d Cir. 2012); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215–16, 215 n.10 (3d Cir. 2001); *see also U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (stating, outside of the constitutional avoidance context, that litigants cannot "extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles" by agreeing on the proper construction of the law); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946 (9th Cir. 2011) ("[W]e are not required to . . . adopt an interpretation precluded by the plain language of the ordinance." (citation omitted)). While other Courts of Appeals take a contrary approach, *see United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 431 (8th Cir. 1988); *Hill v. City of Houston*, 789 F.2d 1103, 1112 (5th Cir. 1986), our precedent is clear, *see Free Speech Coal., Inc.*, 677 F.3d at 539; *Brown*, 586 F.3d at 274; *Saxe*, 240 F.3d at 215–16, 215 n.10.

*Frisby v. Schultz*, 487 U.S. 474, 483 (1988) ("To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties.").

Here, the Ordinance is readily susceptible to a narrowing construction. The text of the Ordinance says nothing about leafletting or peaceful one-on-one conversations, let alone on a particular topic or for a particular purpose. And, to put a fine point on it, the floating bubble zone, which was enjoined years ago, did prohibit "passing a leaflet," "educating," or "counseling." Pitts. Code § 623.03. Those are *not* the activities that remain prohibited in the zone, and "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46:06, at 194 (6th rev. ed. 2000)).

The Ordinance prohibits four—and only four— activities within the zone: "congregat[ing]," "patrol[ling]," "picket[ing]," and "demonstrat[ing]." Pitts. Code § 623.04. And none of those terms, as commonly understood, encompasses the sidewalk counseling in which Plaintiffs engage.[15]

---

[15] In its briefing and at oral argument, the City justified its interpretation by noting that in *Schenck*, the injunction at issue referred to "sidewalk counseling" as a "form of demonstrating," and the Supreme Court did not reject that characterization. *See* Appellees' Br. 48 (citation omitted). But the Court made clear that the term as used by some protestors in that case was misleading given their aggressive actions, *see*

To "congregate" means "to collect into a group or crowd." *Congregate*, Merriam-Webster's Collegiate Dictionary 262 (11th ed. 2005) [hereinafter Merriam-Webster's]; *see also Congregate*, The American Heritage Dictionary of the English Language 388 (4th ed. 2006) [hereinafter American Heritage] (defining "congregate" as "bring or come together in a group, crowd, or assembly"). To "patrol" is "to carry out a patrol," defined in turn as "the action of traversing a district or beat or of going the rounds along a chain of guards for observation or the maintenance of security," *Patrol*, Merriam-Webster's 909, and "[t]he act of moving about an area especially by an authorized and trained person . . . for purposes of observation, inspection, or security," *Patrol*, American Heritage 1290. To "picket" is to "serve as a picket," defined as "a person posted for a demonstration or protest." *Picket*, Merriam-Webster's 937; *see also Picket*, American Heritage 1327 (defining "picket" as "to post as a picket" where "picket" is defined as "[a] person or group of persons present outside a building to protest"). And to "demonstrate" is defined as "to make a demonstration," which is defined in turn as "an outward expression or display" and "a public display of group feelings toward a person or cause." *Demonstrate*, Merriam-Webster's 332; *see also Demonstrate*, American Heritage 484 (defining "demonstrate" as "[t]o participate in a public display of opinion").

Plaintiffs' sidewalk counseling does not meet any of these definitions. While the Supreme Court has noted that a

*Schenck*, 519 U.S. at 363, 381–82, and, as discussed, *see supra* note 6, such conduct falls far outside Plaintiffs' definition of sidewalk counseling.

25

grouping of three or more people may constitute "congregat[ing]," *see Boos v. Barry*, 485 U.S. 312, 316–17 (1988), approaching someone *individually* to engage in a *one-on-one* conversation no more constitutes "congregat[ing]" than walking alongside another person constitutes "patrol[ling]." And while signs and raised voices may constitute "picket[ing]" or "demonstrat[ing]," speaking to someone at a normal conversational volume and distance surely does not. Simply calling peaceful one-on-one conversations "demonstrating" or "picketing" does not make it so when the plain meaning of those terms does not encompass that speech.[16]

Moreover, the activities that the Ordinance does prohibit render it content neutral under binding Supreme Court precedent. No doubt due to the easily identifiable nature and visibility of "congregat[ing], patrol[ling], picket[ing] or demonstrat[ing]," Pitts. Code § 623.04, the Court has repeatedly considered regulation of those activities to be based on the manner in which expressive activity occurs, not its content, and held such regulation content neutral. *See Madsen*,

---

[16] Perhaps because of this disconnect between the Ordinance's text and the specific expressive activities to which the parties have assumed the Ordinance applies, the City's own witness struggled during his deposition to explain which specific prohibition was even applicable to Plaintiffs' sidewalk counseling. For example, when asked "[w]hat part of the Ordinance" would prohibit a sidewalk counselor from crossing into the buffer zone while talking to a patient, the City's designated witness replied, "[c]all it congregating, patrolling, picketing, or demonstrating, or any name you wish to give it." JA 337a.

512 U.S. at 759, 763–64 (addressing the precise language at issue here, "congregating, picketing, patrolling, [and] demonstrating," and concluding that the injunction prohibiting those activities was content neutral); *see also Snyder v. Phelps*, 562 U.S. 443, 456 (2011); *Hill*, 530 U.S. at 721; *Schenck*, 519 U.S. at 383–85; *United States v. Grace*, 461 U.S. 171, 181–82 (1983).[17]  Nor does *Reed* alter that conclusion.  *See Reed*, 135 S. Ct. at 2228–29.

In short, the doctrine of constitutional avoidance counsels that we impose a limiting construction where, as here, a statute has not been construed by a state court and is not only susceptible to a narrowing construction but also demands that construction on its face.  *See Am. Booksellers*, 484 U.S. at 397; *Brown*, 586 F.3d at 274; *Saxe*, 240 F.3d at 215 n.10.  Because

---

[17] We have continued to rely on *Hill* since *McCullen* and *Reed* were handed down,  *see, e.g.*, *Turco v. City of Englewood*, 935 F.3d 155, 165 (3d Cir. 2019) (declining to strike down eight-foot buffer zone as a matter of law because "such a conclusion would be directly at odds with the Supreme Court's decision in *Hill v. Colorado*" (citation omitted)), as have some of our sister circuits, *e.g.*, *March v. Mills*, 867 F.3d 46, 64 (1st Cir. 2017); *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found.*, 846 F.3d 391, 403–04 (D.C. Cir. 2017).  We note, however, that other Courts of Appeals have observed that, even if "neither *McCullen* nor *Reed* overruled *Hill*, so it remains binding on us," the content neutrality holding of *Hill* may be "hard to reconcile with both *McCullen* and *Reed*," *Price v. City of Chicago*, 915 F.3d 1107, 1109 (7th Cir. 2019) (Sykes, J.), *petition for cert. filed*, No. 18-1516 (U.S. June 6, 2019).

27

the Ordinance, as properly interpreted, does not extend to sidewalk counseling—or any other calm and peaceful one-on-one conversations—there is no need for law enforcement "to examine the content of the message . . . to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479 (citation omitted). The Ordinance so read is thus content neutral and subject to intermediate scrutiny.

## C.      Application of Intermediate Scrutiny

Because we conclude the Ordinance does not implicate Plaintiffs' speech, we could end our analysis here if this were an as-applied challenge. But because Plaintiffs have brought a facial challenge, we briefly consider whether the Ordinance as applied to the remaining expressive activity of congregating, patrolling, picketing, or demonstrating within fifteen feet of the clinic entrance is "narrowly tailored to serve a significant governmental interest."[18] *Id.* at 477 (quoting *Ward*, 491 U.S. at 791). We easily conclude that it is.

---

[18] To satisfy intermediate scrutiny, the government bears the burden of demonstrating that a restriction on speech is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication of the information." *McCullen*, 573 U.S. at 477 (quoting *Ward*, 491 U.S. at 791). Plaintiffs do not dispute the "ample alternatives" prong and, with its narrowing construction, "the limited nature of the prohibition makes it virtually self-evident that ample alternatives remain." *Frisby*, 487 U.S. at 483. We therefore focus our inquiry, as do the parties, on the issue of narrow tailoring.

28

As Plaintiffs acknowledge, the interests that the City seeks to protect—unimpeded access to pregnancy-related services, ensuring public safety, and eliminating "neglect" of law enforcement needs—are legitimate.[19] *Bruni I*, 824 F.3d at 368 (quoting Pitts. Code § 623.01); *see McCullen*, 573 U.S. at 487, 496–97 (describing these interests as "undeniably significant" interests that are "clearly serve[d]" by buffer zones); *see also Turco v. City of Englewood*, 935 F.3d 155, 166 (3d Cir. 2019) (recognizing the government's significant interest in "protecting the health and safety of its citizens, which 'may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests'") (citation

---

[19] To the extent Plaintiffs argue that the City's stated interests were not substantiated on remand, the record—including reports of violent incidents, obstruction of patients' ingress and egress, and aggressive confrontations—establishes otherwise. *See supra* Section I.A.1. Plaintiffs' additional argument that there has been no obstructive conduct preventing access to the clinic's entrance in recent years and, therefore, that the Ordinance is no longer necessary is also belied by the record. For starters, there is evidence in the record to the contrary. For example, a clinic escort declared in 2014 that she was "aware of incidents at [Planned Parenthood] in which escorts were pushed by a protester and where protesters placed their hands on patients and thrust their leaflets inside patients' coat pockets or handbags." JA 709a–10a. More importantly, the fact that an otherwise constitutional restriction on speech is successful in serving the interests for which it was intended is hardly a reason to strike it down.

omitted).  Instead, Plaintiffs argue that the Ordinance is not narrowly tailored to those interests.

To be narrowly tailored, a regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 799).  At the same time, it "'need not be the least restrictive or least intrusive means of' serving the government's interest," *id.* (quoting *Ward*, 491 U.S. at 798), and we "afford[] some deference to a municipality's judgment in adopting a content-neutral restriction on speech," *Bruni I*, 824 F.3d at 370.

In arguing that the restriction on speech here is not narrowly tailored, Plaintiffs do not distinguish between the Ordinance as read to include sidewalk counseling and the Ordinance as read to exclude it.  Rather, quoting *Bruni I*, they contend we "already made clear that 'the City has the same obligation to use less restrictive alternatives to its buffer zone as . . . Massachusetts had with respect to the buffer zone at issue in *McCullen*.'"  Appellants' Br. 25 (quoting *Bruni I*, 824 F.3d at 369).  So, say Plaintiffs, just as in *McCullen*, the City had to demonstrate on remand that "substantially less-restrictive alternatives," including arrests, prosecutions, and injunctions, "were tried and failed, or . . . were closely examined and ruled out for good reason." *Bruni I*, 824 F.3d at 370.  Because the City here concededly failed to make a showing of that magnitude, Plaintiffs contend the Ordinance necessarily fails intermediate scrutiny.

Plaintiffs mistake the import of *Bruni I* in two respects. First, in reviewing the District Court's dismissal of Plaintiffs' complaint, we did not conclusively determine that the City

30

"ha[d] the same obligation to use less restrictive alternatives" as in *McCullen. Bruni I*, 824 F.3d at 369. As appropriate at the pleading stage, we "accept[ed] all [of Plaintiffs'] factual allegations as true," *id.* at 360 (citation omitted), and held that "[b]ecause of the significant burden on speech that the Ordinance *allegedly* imposes, the City ha[d] the same obligation to use," *id.* at 369 (emphasis added), or show that it "seriously considered, substantially less restrictive alternatives," *id.* at 357, as in *McCullen*. On that basis, we remanded for a determination of the proper scope of the Ordinance, the actual burden on Plaintiffs' speech, and a means–ends analysis "by the standard that *McCullen* now requires." *Id.* at 375.

Second, to the extent Plaintiffs' argument is that *McCullen* imposes on a municipality "the same obligation" as on Massachusetts—even in the absence of a "significant burden on speech," *id.* at 369—they are mistaken. As we recognized in *Bruni I*, where the burden on speech is de minimis, a regulation may "be viewed as narrowly tailored, even at the pleading stage," *id.* at 372 n.20, and *McCullen* and *Bruni I* both observed that where there is only "a slight burden on speech, any challengers would struggle to show that 'alternative measures [would] burden *substantially* less speech,'" *id.* (alteration in original) (quoting *McCullen*, 573 U.S. at 495). In short, while *McCullen* and *Bruni I* made clear that a "rigorous and fact-intensive" inquiry will be required where a restriction imposes a significant burden on speech, *Bruni I*, 824 F.3d at 372, they also made clear (and logic dictates) that a less demanding inquiry is called for where the burden on speech is not significant—whether due to a

restriction's scope, the size of the speech-free zone, or some combination of the two.[20]

In this case, now that we have before us both a developed record and a narrow construction of the Ordinance, it is apparent that the burden it imposes is different from *McCullen* both in scope and size and is instead akin to that imposed by the thirty-six-foot and fifteen-foot buffer zones that the Supreme Court upheld in *Madsen v. Women's Health Center, Inc.*, 512 U.S. at 757, 776, and *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. at 364, 380, respectively.

---

[20] In *Bruni I*, we explained that when dealing with core speech, such as sidewalk counseling, whether a restriction is less burdensome in "degree"—meaning size in the context we used it—is not necessarily dispositive of whether the burden on speech is significant. 824 F.3d at 368. A court must also consider the burden as "a matter of . . . kind," referring to the type of speech a restriction prohibits. *Id.* Elsewhere in the opinion, however, we also recognized that there may be cases where the "degree" of burden is so minimal that it, alone, will determine whether the burden on speech should be considered significant, thus potentially negating any need for the government to show that substantially less-restrictive alternatives were tried and failed or seriously considered and reasonably rejected. *See id.* at 372 n.20 (quoting *McCullen*, 573 U.S. at 495). As "degree" could refer to the size of the zone or significance of the burden, depending on the context, and both subjects are mentioned in today's opinion, we will use the terms "scope" and "size," rather than "kind" and "degree," for the sake of clarity.

As to scope, although the restrictions in those cases were more targeted in that they were created by way of injunction, not legislation, *see Schenck*, 519 U.S. at 361; *Madsen*, 512 U.S. at 757, the Ordinance is narrower in scope because it limits only congregating, patrolling, picketing, and demonstrating within a fifteen-foot buffer zone, and does not sweep in the "one-on-one communication," including "normal conversation and leafletting," that *McCullen* emphasized "have historically been more closely associated with the transmission of ideas," 573 U.S. at 488. Thus, so long as she is not "congregating" with others in the buffer zone, an individual plaintiff is not barred by the Ordinance from engaging in sidewalk counseling inside its borders. *Cf. Schenck*, 519 U.S. at 367, 369–70, 383–84 (describing and upholding the district court's decision to allow only two sidewalk counselors inside the fifteen-foot buffer zone); *Madsen*, 512 U.S. at 759 (prohibiting not only "congregating, picketing, patrolling, [and] demonstrating" within the zone but also "entering").

And as to size, the relatively small buffer zone imposed by the Ordinance, like those in *Madsen* and *Schenck*, does not prevent groups like Forty Days for Life from congregating within sight and earshot of the clinic. Nor does it prevent protestors, demonstrators, or picketers from being seen and heard, or any of these persons from speaking outside the zone with willing listeners who are entering or exiting. *See Schenck*, 519 U.S. at 384–85; *Madsen*, 512 U.S. at 770. And size, while not necessarily in and of itself dispositive, *see Bruni I*, 824 F.3d at 368, is still a "substantial distinction" that must factor into a court's analysis of the relative burden on speech, *Turco*, 935 F.3d at 163.

33

Also as in *Madsen* and *Schenck*, the record shows that the City resorted to a fixed buffer zone not in the first instance but after attempting or considering some less burdensome alternatives and concluding they were unsuccessful in meeting the legitimate interests at issue. *See Schenck*, 519 U.S. at 380–82; *Madsen*, 512 U.S. at 769–70. These included an overtime police detail in front of Planned Parenthood until the cost became prohibitive once the City was declared a financially distressed municipality;[21] incident-based responses by the police that proved unsuccessful in preventing or deterring aggressive incidents and congestion; and consideration of criminal laws that the police were finding inadequate to address the problem of protestors following patients and obstructing their way to the clinic.

True, as Plaintiffs point out, this record does not reflect that the City tried or seriously considered arrests, prosecutions, or targeted injunctions, which Plaintiffs would have us treat as dispositive. But where the burden imposed by a restriction on

---

[21] In *McCullen*, Massachusetts did not assert such economic hardships. While the Court noted that "the prime objective of the First Amendment is not efficiency," *McCullen*, 573 U.S. at 495, it did not have occasion to consider circumstances where "the limitations of 'manpower' and the need to be able to deploy officers in response to emergencies" made it "not feasible to permanently provide a significantly increased police presence at the clinic," *Turco*, 935 F.3d at 167. As we recently recognized, however, the facts "that the police department ha[s] finite resources," *id.* (citation omitted), and a city has "financial restraints," *id.* at 167–68, are relevant to the narrow tailoring analysis.

34

speech is not significant, the government need demonstrate neither that "it has tried or considered *every* less burdensome alternative," *Bruni I*, 824 F.3d at 370, nor that it tried or considered every less burdensome alternative discussed in *McCullen*. Instead, as we reiterated in *Turco*, this is an "intensely factual . . . inquiry," 935 F.3d at 170, that must account for "the 'broad principle of deference to legislative judgments' and that a legislative body 'need not meticulously vet every less burdensome alternative,'" *id.* at 171 (quoting *Bruni I*, 824 F.3d at 370 n.18). And, as we recognized there in remanding for further fact-finding, a municipality can demonstrate that it "attempted . . . [or] considered alternative means of bringing order to the sidewalk" even if it "ha[s] not 'prosecute[d] any protestors for activities taking place on the sidewalk' and 'did not seek injunctive relief against individuals whose conduct was the impetus for the Ordinance.'" *Id.* at 167 (second alteration in original) (quoting *Turco v. City of Englewood*, No. 2:15-cv-03008, 2017 WL 5479509, at *5 (D.N.J. Nov. 14, 2017)). The ultimate question remains whether a restriction on speech "burden[s] *substantially* more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (emphasis added) (quoting *Ward*, 491 U.S. at 799).

Consistent with *Madsen* and *Schenck*, the Ordinance, as we have construed it, does not do so.[22] The Ordinance

---

[22] We recognize that the City may have a legitimate concern about access to healthcare facilities if it transpires that multiple one-on-one conversations impair access to the facilities, *see McCullen*, 573 U.S. at 486–87, and that the City may then have occasion to revisit the terms of the Ordinance having developed a record that would satisfy *McCullen* and

therefore is "narrowly tailored to serve a significant governmental interest," *McCullen*, 573 U.S. at 477 (quoting *Ward*, 491 U.S. at 791), and it satisfies intermediate scrutiny.

### D. Overbreadth

Finally, Plaintiffs argue that the Ordinance is unconstitutionally overbroad because it authorizes the City to create buffer zones at any health facility in the City, regardless of whether the City has identified a problem at the location in the past. A law may be overbroad under the First Amendment where "a substantial number of its applications are unconstitutional, judged in relation to the [law's] plainly legitimate sweep." *Bruni I*, 824 F.3d at 374 (quoting *Stevens*, 559 U.S. at 473). The overbreadth doctrine is "strong medicine," *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1265 (3d Cir. 1992) (citation omitted), should therefore be "used sparingly," *id.*, and will "not be[] invoked when a limiting construction has been or could be placed on the challenged" law, *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

Plaintiffs' overbreadth challenge is not well-founded. As a general matter, "[t]he fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance," *Hill*, 530 U.S. at 730–31, and its applicability more generally is one of the reasons that we consider it to be a content-neutral restriction on speech, *see id.* at 731. For that reason, "[w]hen a buffer zone broadly applies to health care facilities" to include "buffer zones at non-

---

*Bruni I*, as well as the content-neutrality requirement of *Reed*. *See Turco*, 935 F.3d at 162–63. That, however, is not the Ordinance before us today.

abortion related locations," we may then "conclude 'the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive.'" *Turco*, 935 F.3d at 171 (quoting *Hill*, 530 U.S. at 730–31).

Nor is the Ordinance overbroad because it affords the City discretion to select particular health facilities at which it will demarcate a buffer zone. Since the demarcation requirement was put in place approximately ten years ago, the City has exercised that discretion as to only two facilities, both of which suffered from violence and obstruction in the past. Yet we may not, as Plaintiffs suggest, simply assume that "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612. Instead, we revert again to the "principle . . . well-established in First Amendment jurisprudence"—"our duty to 'accord a measure of deference to the judgment' of [the] city council,'" *Turco*, 935 F.3d at 171 (quoting *Hill*, 530 U.S. at 727), considering "[the] statute's application to real-world conduct, not fanciful hypotheticals," *id.* at 172 (quoting *Stevens*, 559 U.S. at 485). Applying that principle here, we conclude the Ordinance is not substantially overbroad.

In sum, Plaintiffs have not carried their "burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (alteration in original) (citation omitted). We therefore affirm the District Court's grant of summary judgment to the City on this claim.

## IV. Conclusion

For the foregoing reasons, we will affirm the District Court's order granting summary judgment.

*Nikki Bruni et al. v. City of Pittsburgh et al.* (*Bruni II*), No. 18-1084

HARDIMAN, *Circuit Judge*, concurring.

I join the Court's opinion because it rightly construes the Pittsburgh Ordinance to allow conversation on a public sidewalk. I write separately to highlight the impact of *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015). In my view, *Reed* weakened precedents cited in the Court's content neutrality analysis and will constrain Pittsburgh's enforcement of the Ordinance going forward.

I

It is true that the Supreme Court has held that restricting "congregating, picketing, patrolling, [and] demonstrating" around abortion clinics is facially content neutral. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 759, 757–65 (1994); *see* Op. 26–27. The Court has even extended this content neutrality to "wildly expansive definitions" of "demonstrate" and "picket." *Hill v. Colorado*, 530 U.S. 703, 744 (2000) (Scalia, J., dissenting); *see id.* at 721–22 (majority opinion) ("defining 'demonstrate' as 'to make a public display of sentiment for or against a person or cause' and 'picket' as an effort 'to persuade or otherwise influence'" (quoting Webster's Third New International Dictionary 600, 1710 (1993))); *see also Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 374 n.6, 381–82 (1997) (upholding injunction against "demonstrating," even though it would target some "stationary, nonobstructive demonstrations").

The continued vitality of this content neutrality analysis is questionable after *Reed*. Before *Reed*, the Court vacillated

between two tests for content neutrality. *See generally* Genevieve Lakier, *Reed v Town of Gilbert, Arizona*, and the Rise of the Anticlassificatory First Amendment, 2016 Sup. Ct. Rev. 233; Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413 (1996). In cases like *Hill*, *Schenck*, and *Madsen*, the "government's purpose [w]as the threshold consideration." *Madsen*, 512 U.S. at 763; *see Hill*, 530 U.S. at 719; *Schenck*, 519 U.S. at 371–74 & n.6 (relying solely on *Madsen* to hold injunction content neutral). But in other cases, the Court's first consideration was whether a law "draw[s] content-based distinctions on its face." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014). Any law that did so was necessarily content based, no matter the government's purpose. *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116–17, 122 n.* (1991).

*Reed* adopted the latter test for content neutrality. It held that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." 135 S. Ct. at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)); *see id.* at 2237–39 (Kagan, J., concurring in the judgment). By doing so, *Reed* "overturn[ed] the standard that [the Court] had previously used to resolve a particular class of cases"—a class that includes cases like this one and *Hill*. Brian A. Garner et al., The Law of Judicial Precedent 31 (2016) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996), and *Planned Parenthood of Se. Pa. v. Casey*, 947 F.2d 682, 691–93 (3d Cir. 1991), *aff'd in part*, *rev'd in part*, 505 U.S. 833 (1992)). In fact, *Reed* rebuked *Hill* several times: by noting that the errant Court of Appeals relied on it, 135 S. Ct.

at 2226; and by favorably citing dissents in *Hill* authored by Justices Scalia and Kennedy, *id.* at 2229.

*Reed* also seems to have expanded the types of laws that are facially content based. Facial distinctions, the Court explained, may not only be "obvious, defining regulated speech by particular subject matter." *Id.* at 2227. They may also be "subtle, defining regulated speech by its function or purpose." *Id.* Two cases discussed in *Reed* exemplify this subtle content discrimination.

The first, *Sorrell v. IMS Health Inc.*, involved a law that restricted the sale, disclosure, and use of information about drug prescriptions. *See* 564 U.S. 552, 563–64 (2011); *Reed*, 135 S. Ct. at 2227. The Court held content based a provision that allowed the sale of that information for "'educational communications,'" but not for "marketing." *Sorrell*, 564 U.S. at 564 (quoting Vt. Stat. Ann., tit. 18, § 4631(e)(4) (Supp. 2010)). "[E]ducation[ ]" and "marketing" are examples of speech's "function or purpose" under *Reed*. 135 S. Ct. at 2227. They explain *how* or *why* a speaker speaks, not *what* is said. *Id.*

The second case that underscores the protection afforded to speech's function or purpose is *NAACP v. Button*, 371 U.S. 415 (1963). *See Reed*, 135 S. Ct. at 2229. In that case, Virginia "attempt[ed] to use a statute prohibiting 'improper solicitation' by attorneys to outlaw litigation-related speech of the National Association for the Advancement of Colored People." *Id.* (quoting *Button*, 371 U.S. at 438). The *Button* Court rejected that attempt, holding that "advocacy" and "'the opportunity to persuade to action'" are First Amendment rights. 371 U.S. at 437–38 (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945)). Describing the Virginia law over 50

3

years later, the *Reed* Court called it "facially content-based." 135 S. Ct. at 2229.

So *Reed* demands that we construe the Ordinance narrowly. And it steers us away from precedents that focused on a law's purpose rather than its facial effect. For laws once held content neutral because of purpose may well be facially content based after *Reed*. *Compare, e.g.*, *Hill*, 530 U.S. at 720–21 (holding content neutral a ban on "picketing," "demonstrating," "protest, education, or counseling" even though it may require the government "to review the content of the statements made"), *with McCullen*, 573 U.S. at 479 ("The [buffer zone law] would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed . . . .'" (quoting *FCC v. League of Women Voters of Ca.*, 468 U.S. 364, 383 (1984))), *and Reed*, 135 S. Ct. at 2227–29 (highlighting facially content based laws that target solicitation and educational communications). Even some purposes previously held content neutral may now be content based. *Compare, e.g.*, *Hill*, 530 U.S. at 716 (citing "[t]he unwilling listener's interest in avoiding unwanted communication"), *and Turco v. City of Englewood*, 935 F.3d 155, 162, 166-67 (3d Cir. 2019) (citing that interest to support narrow tailoring of concededly content neutral law), *with McCullen*, 573 U.S. at 481 ("To be clear, the Act would not be content neutral if it were concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech.'" (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988))), *and Reed*, 135 S. Ct. at 2227 (protecting speech's "function or purpose").

4

## II

Today our Court does what *Reed* requires. We hold that "[b]ecause the Ordinance, as properly interpreted, does not extend to sidewalk counseling—or any other calm and peaceful one-on-one conversations," the City cannot examine the content of a conversation to decide whether a violation has occurred. Op. 27–28. It will instead examine, for example, decibel level, the distance between persons, the number of persons, the flow of traffic, and other things usually unrelated to the content or intent of speech. *See, e.g.*, *Reed*, 135 S. Ct. at 2228 (confirming that banning sound amplification is content neutral); *id.* at 2232 (stating that "entirely forbidding the posting of signs" is content neutral); *McCullen*, 573 U.S. at 491–92 (collecting laws that, by penalizing conduct like obstruction or assault, may pass intermediate scrutiny).

The Court's decision constrains the City's enforcement discretion. Pittsburgh cannot target quiet conversations even if they are not in a tone of "kindness, love, hope, gentleness, and help." Op. 11 n.6 (quoting JA 574a); *see, e.g.*, *id.* at 25–26. It must allow not only conversations that help and love, but also those that serve any other "function or purpose" within the bounds of protected speech. *Reed*, 135 S. Ct. at 2227; *see, e.g.*, *id.* at 2228–29 (discussing *Sorrell*, 564 U.S. at 563–64 ("educati[ng]" and "marketing"), and *Button*, 371 U.S. at 438–40 ("solicit[ing]," "advoca[ting]," and "urg[ing]")).

And the City's enforcement of the Ordinance must be evenhanded. Consider clinic employees and agents who, under the injunction issued in *Brown v. City of Pittsburgh*, can "congregate" or "patrol" when helping persons enter or exit a clinic. *See* 586 F.3d 263, 273–75 (3d Cir. 2009); *Brown v. City of Pittsburgh*, 2010 WL 2207935, at *2 n.2 (W.D. Pa. May 27,

5

2010); JA 1324a (permanent injunction order). Before today, the City's broad and amorphous interpretation of the Ordinance risked allowing those employees to engage in speech that others could not. That sort of disparate treatment would now be content or viewpoint based. *See Reed*, 135 S. Ct. at 2230 (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995), and *Citizens United v. FEC*, 558 U.S. 310 (2010)). Our decision today clarifies that the words "congregate" and "patrol" address conduct—the assembly of people in one place or the action of pacing back and forth. *See* Op. 25. So interpreted, the *Brown* injunction's narrow exception does not discriminate between types of speech.

With these understandings, I join the Court's opinion.